4 So.2d 140

FRYE v. COMMUNITY CHEST OF BIRMINGHAM AND JEFFERSON COUNTY.

6 Div. 853.

Supreme Court of Alabama.

Oct. 9, 1941.

Robt. W. Smith and Howze & Brown, all of Birmingham, for appellant.

Hugh A. Locke, of Birmingham, for cross-appellant Community Chest.

Smith, Windham, Jackson & Rives, Peyton D. Bibb and Irvine C. Porter, all of Birmingham, for appellees and cross-appellants Paul C. Sorsby, Salome K. Linenthal, Harvey King and Olga Barnes.

Thos. S. Lawson, Atty. Gen., and Wm. H. Loeb, Asst. Atty. Gen., for appellees Alabama College and Alabama School of Trades.

Smyer, Smyer & Bainbridge and W. Bruce White, all of Birmingham, for appellee and cross-appellant Nathalie King Warriner.

Frank W. Davies and Coleman, Spain, Stewart & Davies, all of Birmingham, for appellees and cross-appellants Mable C. W. Smith and Laura Warriner.

BOULDIN, Justice.

This appeal is to review a decree in equity construing the will of Sibley P. King, deceased, and advising the executor upon matters of administration. The bill was filed by the executor. He appeals, but leaves the several parties, upon sundry cross-appeals, to litigate their conflicting interests.

We proceed to consider the features of the decree questioned by one or more interested parties.

In the First Item of the will the testator, after providing for payment of debts and funeral expenses, including a tombstone, made a series of special bequests "unto my beloved charities & churches & institutions."

Three of these, with the decretal order touching same, are as follows:

The will: "United Charities of Birmingham, Ala. One Thousand dollars."

The decree: "That the bequest of $1000.-00 to United Charities has lapsed."

The will: "Alabama Girls' Industrial School of Montevallo, Ala. One Thousand dollars."

The decree: "That the bequest of $1000.-00 to Alabama Girls' Industrial School of Montevallo, Ala., is valid, has not lapsed and should be paid to Alabama College."

The will: "Alabama Boys Industrial School of Ragland, Ala., One Thousand Dollars."

The decree: "That the bequest of $1000.-00 to the Boys Industrial School of Ragland, Alabama, is valid, has not lapsed and should be paid to the Alabama School of Trades."

The will, executed in 1923, was written by the testator in his own hand. He died in 1940. He was a resident of Birmingham.

Questions for our decision are: Did the bequest to "United Charities" lapse, or should it be paid to the Community Chest of Birmingham? Did the bequests to the two schools, or either of them, lapse, or should they be paid as decreed?

By Legislative Act of 1897, Gen.Acts 1896–7, p. 885, certain citizens, and others who should become members, were incorporated under the name of "The Society of The United Charities of Birmingham." It was authorized to own property, to receive gifts and devises, for the purpose of aiding persons, the objects of charity in the city, to establish and operate a hospital for the poor, an industrial school, workhouse or farm, &c.

In 1907 the name of the Welfare Organization was changed from United Charities to Associate Charities, and in 1910 was incorporated under the name of "Associated Charities of Birmingham, Alabama." The objects were "to look after the charitable work of the city of Birmingham and vicinity, to raise money for the expenses of same and in a general way to study and to remedy the sociological evils of the community."

This set-up functioned for some seven years. Gradually public support and supervision of the several welfare agencies passed under the city welfare department.

The Community Chest, long agitated, took the form of an active drive in the fall of 1923, about the time this will was made. From that time to testator's death, the Community Chest functioned, and still functions. Its ministry is quite accurately indicated by the term "United Charities" used in the testator's will.

Alabama College had its beginning by legislative act of 1893, to become effective, January 1, 1895. Acts of 1892–3, p. 1002. This act looked to the location and establishment of a State School under the name of "Alabama Girls' Industrial School," at which girls "may acquire a thorough normal school education." Specific emphasis was given to technical courses, several being listed in the act, and to be extended to others "fitting and preparing such girls for the practical industries of the age." In due course the institution was located by the Board of Trustees at Montevallo.

The name "Industrial School" came to be associated with reform schools; a thought never in the legislative mind, nor in the mind of the management of this institution. This led to a change of name in 1911, again in 1919, and finally in 1923, shortly before this will was made, to "Alabama College." Meantime the college had grown, became a prominent well-known college for women. The law defined it as a "state educational institution of higher learning." Alabama School Code of 1927, § 500, Code 1940, Tit. 52, § 456.

Without question the testator knew the institution well. The college grounds were formerly owned by his grandfather, who built the residence still standing on the campus, known as the "King House."

The courses of study at the time the will was executed had been enlarged "horizontally and vertically;" meaning more courses and more time required for completion. This enlargement proceeded until the testator's death, technical courses continuing as part of the work of the institution.

Clearly this college was the institution in mind in making the bequest to "Alabama Girls' Industrial School at Montevallo, Ala." The Alabama School of Trades, now located at Gadsden, grew out of a legislative act of 1911, to establish "The Alabama School of Trades and Industry" at Ragland, Alabama, for the education of boys and young men "in all of the useful and industrial occupations and in the arts and sciences." General Acts of 1911, p. 383. The school failed to materialize for inability to match the state appropriation by local funds as provided in the act.

The act of 1911 was re-enacted as part of the School Code of 1919, in substantially the same terms. Acts of 1919, p. 645.

Still the conditions for opening the school at Ragland were not met. By an act approved September 29, 1923, a few weeks before this will was executed, the Board of Trustees or Board of Control already in being were empowered to select another location more suitable for the proposed institution. General Acts of 1923, p. 627.

Gadsden was chosen, the school established, and has been in full operation to this day. The terms of the same Board of Trustees were extended to 1927.

The change of location was confirmed, and the name changed to Alabama School of Trades, operating under the original charter. School Code of 1927, § 481, Code 1940, Tit. 52, § 442.

The friends and promoters of the enterprise from the beginning were the movers in changing the location.

Obviously the testator did not concern himself to ascertain the legal names of either of these schools when writing his will. At no time was the boys school named "Alabama Boys' Industrial School." His primary thought was to make bequests to a girls' school and to a boys' school in like amounts; selecting Montevallo School for girls and the proposed Ragland School for boys as the beneficiaries. This main purpose tends to negative an intent to make the location at Ragland a sine qua non for the bequest. Both are State Schools for the education of boys and girls from the entire State.

The same observations apply to the name "United Charities." The testator did not concern himself to learn that the old order under that name had passed away. Probably he did, as a supporter of the Charities of his city, know in a general way of the different set-ups from time to time. His main thought was to make a bequest in aid of the several associated charities of his city to be paid to the responsible agency or set-up receiving and administering such funds at the time of his death. This agency was the "Community Chest of Birmingham."

▮ "Where, from the context of the instrument of gift, or by parol evidence as to the surrounding circumstances, it can be made clear who is intended, a charitable gift is not invalid because the trustee or the donee is erroneously or uncertainly designated, but on the contrary the person or the institution identified as the one intended is entitled to take." 14 C.J.S., Charities, p. 458, § 25.

"In general, however, the misnomer of the beneficiary will not defeat a gift for a charitable purpose. Thus, in case of mistake, inaccuracy, or ambiguity in the description of the beneficiaries of a charitable gift or trust, making it difficult to ascertain and identify them, the court may consider the whole instrument, and may admit parol evidence as to the surrounding circumstances * * * and where, from the language of the instrument, construed in the light of all the surrounding facts and circumstances, the intent of the donor is reasonably apparent and the beneficiaries are ascertainable, the court will not hold the gift void, but will decide who are identified as beneficiaries according to the donor's intent." 14 C.J.S., Charities, p. 482, 483, § 41. See, also, 10 Am.Jur. p. 606, § 30.

Our own cases are in full harmony with these text writers. Tarver et al. v. Weaver et al., 221 Ala. 663, 130 So. 209; National Jewish Hospital for Consumptives v. Coleman, 191 Ala. 150, 67 So. 699.

In the last cited case bequests were sustained to beneficiaries more difficult to ascertain than in the instant case.

▮ The decretal order: "That the bequest of $1000.00 to United Charities has lapsed," is reversed and vacated, and the decree of the lower court here modified in that regard, so as to read: "That the bequest of $1000.00 to United Charities of Birmingham, Ala., is valid, has not lapsed, and should be paid to the Community Chest of Birmingham."

▮▮ The decretal orders touching the bequests to the two schools are affirmed.

The second item of the will reads:

"Second: I give, devise and bequeath unto my relatives as follows: to-wit (in cash or equivalent),—with love and affection, etc., to said:

"Mrs. Idyl King Sorsby—Two Thousand dollars, ($2000.00)

"Mrs. Nathalie King Warriner (of Jacksonville, Fla.), Two Thousand dollars.

"Mrs. Salome King Lynn (daughter of my sister Marritta King) Two Thousand dollars."

The testator had no children. He had three sisters. One of them, Marritta King,

married a King. She died before the will was made. Another sister, Mrs. Idyl King Sorsby, died a few weeks prior to the death of her brother, the testator.

The question for review under this item is: Did the special legacy to Mrs. Sorsby lapse upon her death? The trial court so decreed. Paul C. Sorsby, son, and only surviving child of Mrs. Sorsby, claims it did not lapse and should be paid to him. He insists that this item discloses an intention to make a special bequest of $2,000 to each branch of the family, Mrs. Salome King Lynn, taking in lieu of her mother, &c.

It is sufficient to say the testator made this bequest to his sister, Mrs. Sorsby, alone. He made no provision for such legacy in the event of her death before the legacy came into being.

Courts cannot, under the guise of construction, interpolate provisions not in the bill on the assumption that the testator would have so provided, if it had occurred to him.

Moreover, while the testator did make a like bequest to his niece, daughter of his deceased sister, it cannot be said this was a bequest to her branch of the family. Mrs. King left two children, Harvey King and Mrs. Lynn, known in this suit as Mrs. Salome K. Linenthal. The testator ignored the son and made the bequest to the niece only. In this connection it may be observed that in disposing of his residuary estate, hereinafter discussed, the nephews and nieces did not take as representatives of their respective mothers, but took directly, as relatives of the testator, share and share alike. This applies to the bequest of 1/3 of the residuary estate in fee to the seven nephews and nieces, living at the testator's death, and to the residuary bequests to each of his two sisters, living when the will was made, to come into the possession of the nephews and nieces, surviving the life tenants, respectively. By the death of Mrs. Sorsby during the lifetime of the testator, no life estate intervened, and the remaindermen took directly on the death of the testator. Billingsley v. Harris, 17 Ala. 214.

The special legacy of $2,000 to Mrs. Idyl King Sorsby lapsed by reason of her death during the life of the testator. The decretal order to that effect is affirmed.

The most litigated issues arise in the Fourth Item of the will, the bequest of 1/3 of the residuary estate to Nathalie King Warriner, sister of the testator.

Related Items Third, Fourth and Fifth and the several decretal orders relating to Fourth Item appear in full in the report of the case.

The words: "No trust was created," the opening words of the decree dealing with this bequest, viewed in the light of the pleadings we take to mean: When all or any portion of this residuary legacy is paid over or delivered to Mrs. Warriner pursuant to the decree, the executor will no longer be under any trust obligations touching same. In this holding we concur.

Further provisions of the decree disclose a finding that Mrs. Warriner does take "as trustee," under the express terms of the will, and proceeds to define her powers and duties in dealing with the corpus of such estate which the nephews and nieces of the testator who survive her are to take in possession upon her death.

A much litigated question touching this bequest is: Does the will vest in Mrs. Warriner a power of disposition of the principal or corpus of the funds or properties so bequeathed; either an unlimited power of disposition, or a qualified power, to consume or dispose of same in her discretion for her own benefit so long as the power is not abused by diverting the properties from the remainderman designated in the will to share and share alike?

The bequests to the two sisters in Third and Fourth Items are in identical words, except as to their names. The punctuation in Third Item brings out a bit clearer the obvious intent of both.

The Fourth Item, punctuated as the Third, reads: "Fourth: I give, devise & bequeath, to my beloved sister, as follows, to-wit: One Third of all the *remaining Estate, & net* revenue & proceeds of same, to *Nathalie King Warriner,* as Trustee without Bond—for her own use & benefit, during her life,—and also, at & after her death—Said one-third-interest, of said remaining estate, as above, shall be divided, equally between all my nieces & Nephews —share & share alike—those who survive her,—the Nathalie King Warriner."

This bequest is carefully worded, is expressive of the testator's intent in terms so apt, that there is little need for construction.

"One third of my remaining estate, & net revenue & proceeds of same," defines

the residuary estate, the subject matter of the bequest.

The principal to pass by the bequest is the residue of the estate, remaining after payment of charges and bequests mentioned in First and Second Items; which residue, says the testator, includes the "remaining estate," such of the original properties as remain, "& net revenue," accumulated income in the hands of the executor; and "proceeds" of any property sold by the executor. This bequest is to Mrs. Warriner, "as trustee"—"for her own use and benefit during her life." These are the apt words for the creation of a life estate.

■■■ A life tenant of personalty has, as matter of law, a trust relation toward the remaindermen or reversioners in the preservation of the corpus or principal of the estate. Durden v. Neighbors et al., 232 Ala. 496, 168 So. 887; Amos v. Toolen et al., 232 Ala. 587, 592, 168 So. 687.

But the testator here declares she takes "as trustee," imposes an express trust, a trust to be respected and effectuated because lawfully imposed by the testator's will in making the bequest.

The express provision that Mrs. Warriner take "as trustee," gives emphasis to the testamentary intent to give her a life estate only, the beneficial use of the property during her natural life.

Again, the subject matter of the remainder over is defined as "said remaining estate, as above." Thus, the testator refers back to the residue defined "above;" the principal or corpus of the estate passing by the bequest, being the same estate to pass to the remaindermen.

The estate of decedent consisted of real estate, income bearing at least in part, monies, on hand at his death, and stocks and bonds. This same decree looks to the sale of the stocks and bonds by the executor, thus converting all the personalty into money for distribution to the residuary legatees. The disposition of the real estate remains undetermined.

■■■ A life estate in money carries no power to spend the principal or otherwise dispose of it so as to defeat the estate in remainder. The beneficial use of such life estate is represented by the income derived from lawful loans or investment wherein the interests of the life tenant and of the remainder are alike protected. Money is not property necessarily consumed in the using as in Underwood v. Underwood, 162

Ala. 553, 50 So. 305, 136 Am.St.Rep. 61. Nor is this a bequest of an indefinite estate to the first taker, passing a fee save for the further provision: "At her death the remainder of my estate shall be divided" under circumstances disclosing that "remainder of my estate" meant what remained unconsumed by the first taker. Such was the case of Schowalter et al. v. Schowalter, 217 Ala. 418, 116 So. 116.

The testator had just made a special bequest of $2,000 to Mrs. Warriner, to take absolutely as her own.

■■■ Without further discussion we are of opinion the Fourth Item of the will bequeathes to Mrs. Nathalie King Warriner a life estate only in ⅓ of the residuary estate, with no power of disposition, or entrenchment on the principal or corpus of the estate, and that such principal in whatever form invested at the time of her death, passes to the remaindermen, the nephews and nieces of the testator, who shall survive her, share and share alike. Their right of possession will accrue at the date of her death.

For a full and authoritative discussion of this subject, we refer to a Treatise on "Life Estates, Remainders and Reversioners," in 33 Am.Jur. pp. 722, et seq., §§ 235 to 242, inclusive. See, also, Annotation, 108 A.L. R. 542 et seq.; Jackson v. Jackson et al., 205 Ala. 419, 88 So. 664; Stewart et al. v. Morris, 202 Ala. 113, 79 So. 579; Wilder v. Loehr et al., 211 Ala. 651, 101 So. 591.

■■■ The decree touching the residuary legacy to Mrs. Warriner, paragraph 6(a) (b) (c) (d) is, in all respects, affirmed.

This brings us to consider paragraph 9 of the decree, which reads: "That the prayer, contained in some of the answers, asking that the Court require Nathalie King Warriner to give a bond is denied without prejudice."

Mrs. Warriner has now reached the age of seventy-seven years. She is a non-resident of Alabama; resides in Jacksonville, Florida.

■■■ Here is an Alabama will, disposing of Alabama property. A court of equity in Alabama has jurisdiction of the estate, charged with the responsibility of construing the will, and making a disposition of the estate protecting the interests of legatees under the will. A new statute in Alabama prescribes the method of ascertainment of principal and income as between

life tenants and remaindermen. Acts 1939, p. 902, Code 1940, Tit. 58, §§ 75–87.

■ The court's decree properly required conformance to this statute. Another statute prescribes legal investments of trust funds. The decree declares this statute applicable.

The will, as before noted, bequeathes this property to the life tenant "as trustee." This, as we have held, is an express declaration of a trust relation, further evidencing that the first taker has a life estate only. We do not hold this means a different character of trust from that inhering in the position of a life tenant toward the remaindermen, often deemed a quasi trust because it is connection with the property rights of a life tenant. Such trust obligation is defined in Restatement of the Law of Property, Vol. XX, § 204. The testator, in creating this estate, declared the life tenant should hold "as trustee, without bond." So far as appears, Mrs. Warriner was a non-resident when the will was made in 1923.

How far "without bond" in such connection should control in the matter of security for the remaindermen is the most difficult question before us.

The fund, by this decree, is to be turned over to an elderly lady, in a foreign state in the form of money. The safe investment of money to yield a substantial income, as well as payment of the principal, is a decided responsibility; one more difficult now than in 1923. Mrs. Warriner, apart from her age, does not appear to be experienced in handling such funds. This trust continues until her death. Identifying the investment, as well as all questions as to her fidelity must be determined after her mouth is closed by death. She is expected to have followed the laws of a state other than that of her residence in making investments, and apportioning principal and income.

■ Non-residence, within itself, in the absence of testamentary provisions to the contrary, is generally held to involve such hazard, inconvenience and expense to the remaindermen as to endanger their interests to such extent that security should be required; or the estate retained under the jurisdiction of the court, and managed by a trustee of the appointment of the court. Restatement of Law of Property, Vol. XX, §§ 202, 203, d; 33 Am.Jur. pp. 713, 715, §§ 222, 224; Jackson v. Jackson, supra.

■ A court of equity, as a proper safeguard to the remaindermen, will require security for funds distributed to a life tenant. This is the long settled rule in Alabama. Sewell et al. v. Sewell, 207 Ala. 239, 92 So. 475.

■■ The court of equity has inherent power under the law of trusts to make such orders touching properties within its jurisdiction as will protect all interests. The directions of a testator, touching bond, an administrative matter, may be disregarded in effectuating the substantive property rights created by the will.

The incidents of passing the property to a non-resident life tenant are not different whether the will calls for a bond or otherwise.

■ We are of opinion the question of safeguarding the estates of these remaindermen should be determined in advance, not after the property has passed into the keeping of the non-resident tenant for life. Embarrassments to all parties in the latter event can be easily foreseen.

■ The proper rule is to give the life tenant an election to give a bond with local sureties, submitting the obligors to the jurisdiction of the court, conditioned to account for and deliver the principal of the estate as equity shall require; and if the life tenant elects not to give bond and assume the responsibility of managing the trust property, the funds should be paid into court and committed to a trustee of the appointment of the court, the income to be paid over to the life tenant from time to time as the court shall decree, and the corpus held for the remainderman. Jackson v. Jackson, supra.

■ Inasmuch as the testator's intent was to give Mrs. Warriner the full benefit of the net income on the estate to be bequeathed, we think and hold that the costs and expenses incident to the management of the estate by an outside trustee, if appointed, should be a charge on the corpus of the estate, and not go in diminution of the income of the life tenant. 65 C.J. p. 947, § 868.

The decree of the trial court is modified by striking paragraph 9, supra.

As herein modified, said decree is in all things affirmed, and the cause remanded

for further decretal orders in accord with this opinion.

Let the cost of the appeal, and all cross-appeals, in this court and the lower court, be taxed against the executor as such, and paid from the assets of the estate as part of the costs of administration.

Modified and affirmed.

GARDNER, C. J., and FOSTER and LIVINGSTON, JJ., concur.